Mr. Wren, you may proceed. Good morning, Your Honors. May it please the Court, Peter Wren on behalf of Appellants. I'll reserve five minutes for rebuttal. The law at issue in this case seeks to blanket the entire state of Idaho with a mandate of discrimination and ban every transgender student in every school from every facility matching their gender identity. Before last year, there was never even a local policy in Idaho that did so. And there is not a single piece of evidence that that long-standing status quo harmed a single person. But overnight, SB 1100 would yank transgender students out of the shared facilities that they've used for years without incident, banish them to single-user facilities isolated from their peers, and rob them of their sense of belonging. A preliminary injunction is warranted by each of our claims, but if I could, I'd like to begin with equal protection before discussing Title IX and the impact of the new regulations. Defendants concede that heightened scrutiny is required under equal protection, regardless of whether you view the law as discriminating against transgender students based on their sex or their status. That means that the law is presumptively unconstitutional, and the government bears the heavy burden of proving an exceedingly persuasive justification with evidence. That is an extremely fact-bound standard, as this Court has recognized, but Idaho hasn't lifted a finger to meet that factual burden. There is not one crumb of record evidence in support of Idaho's privacy or safety rationales. That alone is fatal. And that silence speaks volumes because a huge swath of Idaho schools have even had inclusive policies explicitly permitting transgender students to use facilities matching their gender identity. Counsel, I'm correct. You brought only a facial challenge. It was both facial and as applied, but as we've noted, sometimes the label is a bit deceiving because we haven't sought relief as to, for example, the prohibition of cisgender people from facilities different from their assigned sex. But you sought to have the entire law enjoined. As applied to transgender people, yes. Yes, but not, for example, as applied to the particular plaintiff. I think it's both, Your Honor. Go ahead. The scope of relief here is as to the law as a whole, as applied to all transgender people in the state of Idaho. And that would, of course, include the named plaintiffs, Rebecca Rowe, and the student organization. What do you do with the Labrador case that the Supreme Court recently handed you? Absolutely, and I'm fully aware that this court has taken back the Hecox decision in order to address the import of Poe v. Labrador. But that type of narrowing of relief to only the named plaintiffs wouldn't be appropriate here for a very simple reason. I'm not sure it's appropriate in Hecox, so I'll just stop you there on that assumption. I understood absolutely, Your Honor. But to the extent that that is an argument that defendant would like to make, which they've never made to date, the important point is that they never made it below. It was absolutely waived. Nowhere in their opposition to the motion for a preliminary injunction, which can be found at District Court Docket 47-1, was this argument made. So that's not on the table at the moment. And furthermore, if they had raised that argument, we would have been able to respond in due course. So, for example, if a transgender student was traveling to another school for whatever reason, be it a debate tournament or to watch a football game, they would also be subject to challenge by other students for their use of the facilities. After all, part of how this law works is that it essentially encourages students to police each other's facilities usage. And so it would be totally unworkable for a school to tell its students, SB 1100 doesn't apply today because we have a transgender student who's visiting. So that's one example of how the relief that is necessary here has to be statewide in scope, which, of course, mirrors the scope of the constitutional violation. I'd like to follow up on your assertion that the state or your statement that the state doesn't have any evidence. And you said that speaks volumes. The state's asserted interest here is in preventing embarrassment, shame, and psychological injury. And what we said in Byrd v. Maricopa County is that the desire to shield one's unclothed figure from the view of strangers, particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity. So I'm not so sure they need evidence of this fact that you're challenging. Well, I do think it's their burden under heightened scrutiny to actually offer evidence in support of the justifications. So that's one part of the problem. But the other part of the problem— Can you fill that in? I'm not sure you're answering that. What about our observation in Byrd? Well, Byrd involved adverse parties, where we know that there was a plaintiff who objected to the strip search that was conducted at issue there. But here we don't have any evidence from any student saying that I object to sharing facilities with a transgender student. And more importantly, that wouldn't be sufficient in any event to justify the categorical ban that SB 1100 imposes, because Idaho hasn't shown why other nondiscriminatory measures wouldn't be able to address any concern about bodily exposure. In every context regulated by SB 1100, schools can take steps to prevent bodily exposure. The most obvious example of that is maintaining doors on restroom stalls. Anyone who wants to avoid being seen by others simply needs to close the door behind them. And the same type of solutions are available in every single context regulated by the law. The record that the court actually does have before it shows that transgender students like Rebecca Rowe and A.J. have been using the facilities matching their gender identity for years without any evidence of harm. And that's further corroborated by the unrebutted testimony of both school administrators and law enforcement who have overseen inclusive policies governing tens of thousands of students for years. But you seem to be suggesting, sir, that because this provision could have been drafted more narrowly, that it was required to be drafted more narrowly. That's not my argument, Your Honor. It's that there will always be nondiscriminatory measures available to the extent the concern is about preventing bodily exposure. Now, to the extent the argument is the mere presence of a transgender person in this facility violates my rights, there's a different response to that. I don't think that's the assertion, so please proceed with your argument. Certainly. So the other point I want to raise about BIRD, and I think Parents for Privacy makes this point, is that all of those cases that are related to BIRD involve coercive settings where it was, for example, a parole officer barging into a restroom in order to see what the person inside was doing. Another instance involved a government officer taking gratuitous nude photographs of a victim. Those cases, in the words of Parents for Privacy, were egregious, totally different from the context of the school environment, which we have here. Why is it different, though? Well, it's different because the power dynamics, of course, between, let's say, a police officer and someone in custody is not the same as between two students, one transgender who's washing their hands in the sink while the other person happens to be in the same room. But this law, of course, includes showers and locker rooms, and it's not voluntary that kids take PE class or use the showers that are available for the gym, right? Well, as to those facilities, again, the same nondiscriminatory measures that can protect and prevent bodily exposure are equally available there as they are in the restroom. So let's take the example of locker rooms. That goes back, I think, to you asserting that they really were required to adopt a different provision because it was possible to tailor this more narrowly. The point is... I don't know how to get around that conclusion. That seems to me to be what you're arguing. Why am I wrong? If I understand the argument correctly... It's not an argument, it's a question. I'm trying to figure out what you're arguing. Are you arguing that this fails because they could have more narrowly tailored? It fails for two reasons, and I think of the government's arguments in two buckets here. One is they say we have to exclude transgender students because there's no other way we could prevent bodily exposure. But the record that's before this court confirms that we've had inclusive policies in Idaho for eight years, and there's no evidence as to why that has actually materialized as a problem because, again, an opaque barrier. So if I could just use the example of a locker room, for instance, the reason why a privacy solution is available there to a student who objects to being seen by anyone else, including a transgender student, is that they can also go use a restroom stall in which to change. As to showers, the same point remains, that you can put up shower curtains. There are always going to be solutions that can prevent bodily exposure. So that leaves the only other argument that the government has available to it, which is about the mere presence of a transgender student. And this Court's decision in parents versus parents for privacy makes clear that that is not a sufficient interest to justify the exclusion of transgender students. It said, quote, there is no privacy interest not to share restrooms or locker rooms with transgender students. We're talking about transgender students who are using the facilities for the same ordinary and permissible purposes as other students. And this Court recognized that even though that may cause subjective discomfort on the part of cisgender students, that that was not, as an object of matter, legally sufficient as a basis for ousting transgender students. Is it your contention or understanding that Idaho is asserting that this interest that I've just described and quoted as the state's interest in preventing embarrassment, shame, and psychological injury is the assertion of a constitutional right? That's not, I believe, Idaho's argument. They're saying that there could be an interest. But I think that parents for privacy is nonetheless instructive on the point. We recognize that it, of course, doesn't resolve this case. It doesn't answer the same question that's presented here. But the same reasons why this Court in parents for privacy was persuaded by the Seventh Circuit's reasoning in Whitaker was that the transgender student's presence poses no greater risk to other users of that facility than any other student who's using the facility at the same time. But, again... Mr. Courtier didn't get to safety concerns. He made his decision solely on the privacy concerns. That's absolutely right, Your Honor. But I do think that safety also provides no justification for the law here because Idaho already has, and so the safety justification, to be clear, is the concern that cisgender students will engage in an elaborate charade of pretending to be transgender in order to access facilities where they're not supposed to be. And Idaho already takes steps to prevent that. So Boise School District, for example, for the last eight years has had a policy involving school counselors and written gender support plans to ensure that requests are actually legitimate. And furthermore, the unrebutted expert law enforcement testimony in the record from the president of the Idaho Association of School Resource Officers confirms that schools already have all the tools that they need in order to address any misconduct. And SB 1100 adds nothing to that arsenal. So have you considered the recent amendments to or recent Title IX regulations and how they might affect our decision in this case? Absolutely, Your Honor. So we believe that we have a likelihood of success even without on the Title IX claim, even without those regulations. But I do think that the existence of the regulations makes that likelihood even more certain. But if I could just take one step back, the Title IX claim really turns on two separate issues. The first question is, is there discrimination based on sex? And the second question is, is there an exception that nonetheless excuses it? The answer to the first question is yes, by defendant's own admission. And the answer to the second question is no, regardless of whether you're looking at the current regulations or the new regulations that were recently released. So first, SB 1100 invariably discriminates based on sex against transgender students. And we know that because of Bostock. Even if you view sex as nothing more than the sex a person was assigned at birth, that's still the reason why a student like Rebecca Rowe is excluded from the girls' facilities. So does that mean that the current regulations under Title IX discriminate on the basis of sex? No, Your Honor. Or allow discrimination on the basis of sex? No, Your Honor, because the regulation, the existing one, that Idaho relies upon only says that you can provide sex separation in facilities. But the reason you can do that is because that practice doesn't generally cause harm. At the point that you try to apply the regulation in an instance where it does. I don't understand the second part. I mean, I'm looking at 34 CFR 106.33. A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities shall be comparable, et cetera. And I believe that when Title IX uses the word sex, it's talking about the sex assigned at birth. And so to me, if your argument were correct about Title IX, 106.33 would authorize discrimination based on sex. Why am I wrong? The key word that I think is missing from that regulation that you just read is the word discrimination. So the statute itself prohibits discrimination on the basis of sex, which we know from Bostock means differences in treatment that injure protected individuals. That's the definition of discrimination. So when you're just separating students, let's say it's cisgender students based on sex, there's no discrimination there because it doesn't cause a cisgender student injury and harm to be excluded from a facility designated for another sex. But when you try to apply that regulation in the context of a transgender student to exclude them from a facility matching their gender identity, that does cause them harm, and therefore it is discrimination. So there is no carve-out. I apologize. I'm just missing your argument because the way I read 106.33, it authorizes recipients to do what you're saying is discrimination because they are authorized, as I read it, to establish facilities that are just for people of the sex they were born with. That's not discrimination as applied to cisgender people because it does not cause them injury. To the extent that the regulation is trying to authorize discrimination, that's not something that they can do because the statutory mandate is what controls over the regulation. But I do think that the new regulation that will be applied in August does make clear that the safe harbor that defendants are seeking here doesn't actually exist. And, again, we are the ones who view the Title IX claim as a statutory one that can be resolved purely by the words of the statute. It's defendants who are the ones claiming that you should look at the regulations because there's a safe harbor there. So our arguments don't, to be clear, rely on agency deference. It's the defendants who claim that the regulations provide them something which it cannot do because it would then carve out from the statutory nondiscrimination rule something that Congress said you're not allowed to have in the context of facilities. Congress separately said in a different provision that it was okay to have sex-segregated dormitories, right? That's absolutely right, Your Honor. Living facilities was the language, which isn't implicated here by SB 1100. Except you're asking us to assume that in 1972, I think, right, at a time when Congress thought that was okay, that it felt necessary to speak specifically to bathrooms and to shower rooms. In other words, it seems to me that would have gone without saying at that time, and you're asking us to read in. I don't think that's right, Your Honor. There are exceptions to Title IX, statutory ones, a number of them, that Congress chose to write in, which indicates that Congress knew how to write an exception when it wanted to. It would have accepted dormitories but not showers? That is absolutely Congress's prerogative. In 1972, that that was what they were doing? They said the limits, the parameters of the exception go as far as living facilities. Essentially, defendant's argument would have this Court rewrite that provision, statutory provision, and say what Congress really meant was living facilities, comma, restrooms, comma, locker rooms. That is not within the province of this Court. It's not a spending clause. The spending clause argument certainly has no force at the point that the new regulations have taken effect, and the government is well aware of the reach of those prohibitions. But separate and apart from that, there is clear notice from the language of Title IX itself because the law broadly prohibits the full scope of discrimination based on sex in all its forms. The statute doesn't try to list off every instance of discrimination. And so when recipients take Federal dollars, they do so knowing that their liability will be subject to judicial determination. And the prime example of that is harassment. There was a time when lower courts held that harassment was not covered by discrimination. But the Supreme Court subsequently corrected that misunderstanding. This case is no different. And all of defendant's arguments would equally apply to this Court's decision in Grabowski itself, which recognized that Title IX does reach harassment based on perceived sexual orientation. So ultimately, it's the broad scope of the statutory mandate that gives defendants notice that they are responsible for all forms of sex discrimination. And unless there's further questions, I'll reserve the balance of my time for the meeting. Thank you. All right. Thank you, Counsel. Ms. Hawley. Madam Chief Judge, and may it please the Court, Erin Hawley for the State of Idaho. Consistent with its duty to educate and care for all of the state's public school students, Idaho enacted SB 1100, a law separating intimate spaces by sex and providing a sex-neutral accommodation for anyone uncomfortable with using the boys' and girls' spaces. Plaintiffs attack that legislation facially and say it violates both the Equal Protection Clause and Title IX. But SB 1100 substantially relates to the state's important interest in privacy. As this Court said in Hecox, bathrooms and other intimate spaces are, quote, by their very nature, implicate important privacy interests. This is even more true in the school setting where adolescent children are still As for Title IX, that statute plainly contemplates the very law at issue here. It authorized schools and states to separate intimate spaces based on sex. As the late Justice Ginsburg noted, separate spaces to disrobe, sleep, and perform personal bodily functions are not only permissible but sometimes authorized. Plaintiffs' far-reaching theory is deeply harmful to the decades of progress in the academic setting made by girls and women. It dissolves important barriers in intimate spaces and pushes girls to the margins of programs, both academically and athletically. Neither the Equal Protection Clause nor Title IX requires such a result. I welcome the Court's questions. Do you think there's a distinction between under the Equal Protection Analysis, do you think there's a distinction between restrooms versus changing facilities and overnight lodging? We don't, Your Honor. For the reason, as this Court said in Hecox, that bathrooms, by their very nature, implicate the most fundamental Hecox did not decide that question. Hecox just noted a difference between outdoor athletic facilities and private areas because that was not an issue in Hecox, but Hecox did not decide this question. Sure, Your Honor, and we're not arguing that it did, but what Hecox did do was it recognizes that personal spaces, intimate spaces like bathrooms, do implicate these personal privacy interests. As Justice Ginsburg said, engaging in the most private of bodily functions, in addition to sleeping or showering with someone of the opposite sex, involves the most basic of privacy interests. That's why Congress said that sex permissible restrictions were permissible in Title IX, precisely as Senator Bye said, in promulgating that statute to protect these sorts of privacy interests. So we think the privacy interests inhere not only in bathrooms, but as well in showers, in locker rooms, as well as in overnight accommodations. And with respect to the equal protection claim, as Judge Bennett noted, the plaintiffs here are bringing a facial challenge. That means under Salerno that they must show that in each and every application that statute is unconstitutional. That's simply implausible. Again, Title IX authorizes the very statute Idaho enacted here. Idaho not only did its best to protect all of its students' privacy interests, but as well offered an accommodation to anyone who didn't feel comfortable using the boys' and girls' spaces. There's no question that this statute satisfies Salerno, and plaintiffs' claims must fall on that basis alone. In addition, even if this court looks at the as-applied claims, there's simply no allegation sufficient for any of the claims to meet this court's as-applied challenge standard. Of course, we agree. Counsel, let's say there had been a different claim before us. Let's say the claim had been that Rebecca Rowe is going to be fundamentally harmed by the use of this statute in the new school, that there are going to be children attending, and that there was going to be irreparable harm to Rebecca Rowe from the application of this statute in that school. Would Idaho's arguments be exactly the same in response to that in terms of the privacy, the law, et cetera, even if we were looking at one student in one school? Would Idaho be saying, no, these privacy interests that we're in general advancing bar that claim on the merits? So we agree, Your Honor. That would be a tougher claim because, of course, under a facial challenge, plaintiffs bear the burden under Salerno. But even with respect to that sort of as-applied challenge, which plaintiffs have not brought, we do think that the statute at issue here makes distinctions not based on transgender status, but consistent with longstanding practice, divides intimate spaces into boys' and girls' spaces based on biological or sex assigned at birth. Given that, Your Honor, as this Court said in Hecox, as it said in Byrd, as the Supreme Court said in Virginia Military Institute, as well as Nugent v. INS, there are important privacy interests in shielding one's body from the eyes of the opposite sex. And we think that would apply in each and every case to which SB 1100 applies. But, again, an as-applied challenge might be tougher, but it's simply not presented here. Counsel, I apologize for not knowing the answer to this question, but is there anything about the procedural posture of this case which would prevent plaintiffs from making that argument or bringing a new type of preliminary injunction motion if we were to affirm the decision of the district court here? So I think it was absolutely within plaintiff's purview to bring that sort of challenge. No, no, no. I'm saying, is there anything now? The case is still pending. That's correct, Your Honor, yes. Is there anything, to your knowledge, that would prevent plaintiff from, if we were to affirm the denial of the preliminary injunction as sought, that would prevent that type of as-applied claim in the future in this case? I don't think so, Your Honor. I think on the merits, that claim would still fail for reasons that I can explain, but I don't think that there's anything procedurally that would bar plaintiffs from making that sort of as-applied challenge and putting that sort of evidence in the record. With respect to the merits, though, we think the analysis would be the same, and the reason being is, under intermediate scrutiny, what's needed is a substantial relationship to an important state interest. As Judge Kristen pointed out, that there's nothing novel about recognizing a privacy interest in one's most intimate hygiene functions, as well as disrobing in front of the opposite sex. VMI recognizes this. Byrd recognizes this. Hecox recognizes this. And in addition, the legislative findings, under which case Turner versus FCC the Supreme Court says that the legislative findings, even under intermediate scrutiny, are something courts should pay close attention to. And those legislative findings clearly lay out the state's important interest in privacy. To look just to address — Could I stop you there? Because I'm going to push back on this. What I recognize is that the state's interest here is in preventing embarrassment, shame, and psychological injury, which is, I think, opposing counsel has acknowledged, something that falls short of a constitutional injury. But it seems to me, if that's the state's interest — and I think it is. Yes? Is that correct? I think that's part of the state's interest, Your Honor. I think the state's interest is protecting the privacy of all of its public school students. Okay. I think that's a slightly different articulation, but I'm not sure it matters for the purpose of this next question, because it does seem to me that if this claim were an as-applied challenge and spoke to bathrooms without sweeping in the other facilities that involve disrobing in front of members of the opposite sex, that the analysis would be substantially different. And I think you're saying it wouldn't be. Is that right? So I think there's inherent privacy interest in both. I absolutely agree that there's privacy interest involved in disrobing or showering before members of the opposite sex, as would be required on a sports team, for example. But there's also inherent bodily functions in bathrooms that we think are also private. Bathrooms, of course, are also used to change. And I think as for plaintiff's suggestion that, you know, just put a curtain up or put a stall door up, you know, divide the urinals, things like that, would be appropriate if this case was on a strict scrutiny standard. But, of course, those sorts of gesturing towards things the states might do are impermissible at an intermediate scrutiny stage, Your Honor. So we think that intermediate scrutiny is met both for bathrooms, as well as certainly for things like showers and overnight accommodations. And you think the analysis doesn't change? My question was actually whether the analysis changes. And I thought that I heard you say in response to Judge Bennett's question, you think it does not. So I think the privacy interest supports both the state's interest in providing for sex-separated bathrooms, as well as sex-separated showers and overnight accommodations. So I think the same interest in protecting the privacy. Again, we're talking about adolescent girls who, as the record reflects, the amicus briefs are in dire straits, mental health straits. And these adolescent girls may be forced to change or shower or use the bathroom next to a biological male. And those sorts of privacy interests. You keep sweeping and showering. And my question, just to be clear, was not that. Maybe you've answered it the best you can, but it does seem to me to be a significantly different analysis if we were just talking about bathrooms. So maybe I've made my point, and maybe you've answered the question. So, again, Your Honor, I think the privacy interests are the same. But even if you disagree, and it sounds like you might, even if you disagree, that the plaintiff's challenge here is a facial one. So under Salerno, they have to show that each and every application of the statute is unconstitutional. That's simply implausible under either of these statutes. And to talk just a moment about the Title IX challenge, we do agree that the spending clause legislation is especially relevant here. As Your Honors pointed out in 1972, there's nothing to indicate that Congress intended a law that was supposed to advance and promote women's interests in academic and sports to mean. And the government's theory under the new Title IX regulations, plaintiff's theory in this case, let's be absolutely clear, it is absolutely limitless. It means that the NCAA's rules regarding testosterone testing, regarding its sport-by-sport analysis, those would fall. In addition, it would mean that soccer, it would mean swimming, it would mean sororities, all of those sorts of things that are traditionally reserved for women and girls would be subject, would be open in addition to intimate spaces like those at issue under Idaho's law. It's clear that the text structure and history of Title IX is all against that interpretation. With respect to the text, as was mentioned, Section 1686 expressly carves out living facilities. In addition, if you look at 1681A6, that provision includes things like sororities and Girl Scouts, again, things that wouldn't make sense if the definition of sex was fluid, Your Honors. It clearly contemplates that in order to advance women's interests in academic and sports, Congress recognized, as Justice Ginsburg eloquently said, that there are times when the Constitution and Title IX not only permit but also require separation based on sex. So we think that neither the Title VII claim nor the Equal Protection Claim gets off the ground in this case for both of those reasons. And I would also just point, Your Honors, to the district court's careful opinion in this case. Again, this was the same district court that decided the Hecox decision. In Hecox, the court came out against the state of Idaho. In this decision, the court held for the state of Idaho. And on the Equal Protection grounds, the reason the court found for Idaho was it acknowledged that there's a longstanding privacy interest in intimate spaces, and it also acknowledged that there's, quote, no doubt that SB 1100 substantially advances the state's interest because bathrooms, locker rooms, overnight accommodations are the places where it's most likely that students would find other students in a partial or full state of undress. With respect to Title IX, the district court rejected the very same argument made by the government in the new Title IX regulations. It looked at the text of the statute, and it said that's simply something that Congress would not have countenanced in 1972. And I think another thing that's important to realize here, both about the way the statute operates and with respect to the district court opinion, is the statute differentiates based on sex. It does not differentiate based on transgender status, as plaintiffs would have you believe. As the district court found, and this is at ER 20, there simply was, quote, no animus on the state of Idaho in enacting SB 1100. Instead, what the court did was separate based on sex in order to advance the state's longstanding privacy interest. Indeed, the district court, again, this is the same district court that decided Hecox, and the district court went on to sort of chide plaintiffs in this case and say, you know, plaintiffs lob a lot of accusations at the state of Idaho. But the court said that read in context, it was clear that those statements did not demonstrate any animus, that people on both sides of this policy issue can disagree, but that the state of Idaho did its best in seeking to protect the interest. Counsel, I'm going to push back on that. Isn't it true that the only students actually affected by SB 1100 are transgender students? No, Your Honor, that's absolutely incorrect. The statute separates out biological men and biological females. Right, but it's the only change to anybody is to transgender students. That's not correct, Your Honor, because the statute before, due to confusion over the Dear Colleague letter, which was issued in 2009, school districts in Idaho had done different things. But the statute. No, I think the record says that 25 percent of the schools in Idaho had inclusive policies and 75 percent had no policies at all. So that's correct, Your Honor. But what the record goes on to reflect is that those 75 percent, it was testified that those 75 percent generally separated into male and female restrooms, consistent with longstanding tradition and policy. Right, but they allowed transgender students to use the restrooms consistent with their gender identity. No, ma'am, I don't think that's correct. If you look at the record, 25 percent of schools did that, but not the other 75 percent. They didn't have a formal policy, but they generally divided the restrooms. They didn't have a policy. I think Judge Nye chastised the government in a footnote for misrepresenting the policy of the other 75 percent of the schools. So I think there was a declaration, Your Honor, that was misinterpreted. But what I'm saying here is accurate. There was 25 percent that had inclusive policies. The other 75 percent did not have a policy in place, but it was testified that generally those schools did separate based on sex, on male and females. In addition, Your Honor, in putting all that to one side, what SB 1100 does is it separates based on sex. So it applies in the mine run of cases to students who are not transgender. To the extent plaintiffs seek to carve out those affected as being transgender students, that is a disparate impact claim under which they must prove animus. Again, the district court's factual conclusions at ER 20 are not clearly erroneous. In fact, the district court found there was no animus. And for plaintiffs to sort of suggest that the Equal Protection Clause analysis turns on those who are affected, on plaintiffs, that that sort of definitional ploy would turn the Equal Protection Clause into a plaintiffs always win type of theory. That's why disparate impact under the Equal Protection Clause requires animus. That animus under the district court's factual findings is lacking here. What Idaho did was do its best. Well, I can recite to you several things that would lead to the conclusion that some of this was pretextual. For example, Senator Chris Trachel attended a school board meeting in 2023 where he said, you under Idaho law are required to maintain the morals and the health of all students. And thereafter, Senator Cindy Carlson wrote that we need to send the message that we want to educate the kids of Idaho, not indoctrinate them with this garbage. And the fact that SB 1100 itself was drafted by the Idaho Family Policy Center whose mission is to promote God-honoring public policy and biblical truths and sexuality and gender. And then we have Senator Trachel again saying the Idaho Republican Party recognizes that children are a heritage of the Lord. We believe biological gender to be an essential characteristic of a child's identity and purpose. And I can go on with the statements that were made by the various legislators who enacted this law. So many of those statements, Your Honor, were outside the legislative context. But regardless, the district court looked at all of those statements in this case. And again, he sort of chided the other side and said, you know, despite the repeated arguments that plaintiffs make impugning the integrity and motives of the Idaho legislature, they had, quote, no animus. I've read that section of the opinion with interest, especially what Judge Nye says, that the court receives enough hate mail and hate calls to know that there are people on both sides of the equation who do not have respect for the other side. And it caused me to wonder, since this is the same judge that wrote Hecox, is he receiving a lot of threats and hate messages because of his rulings in some of these cases? So I think the import of that part of the opinion, Your Honor, and I can't speak to the judge's sort of motives for writing it, but I think if you look at his words, what he's saying is that there are reasonable people on both sides of this policy issue, and that his lane was to follow the law that neither the Equal Protection Clause nor Title IX prohibited Idaho from separating intimate spaces. Again, we're talking about showers, as I was discussing with Judge Christin, as well as bathrooms. And these have, from time immemorial, been separated based on sex. And the district court goes on. Again, I point, Your Honor, to ER 20, where Judge Nye is clear that there was, quote, no animus. In Hecox, this court deferred to the very same findings at the very same stage by the very same district court judge. I don't think they're clearly eroded here, and so I think that animus standing must be deferred to under this court's precedent. I do have one more question because I think your answer here might differ from what I understood from your briefing about the extent to which the status quo changes here and how this case may be different from Hecox. And as Judge Wardlot acknowledged, the Hecox opinion has been withdrawn at the moment, but you've invoked it several times, and it is the same district court judge. And in that case, there was an analysis that explained the status quo and how it changed only for transgender students. And I understood from your briefing that your position was that this statute that we're talking about in this case changed the status quo for everybody because it also required, upon request, gender-neutral bathrooms and facilities. But I don't know if you're abandoning that or changing that or if I misunderstood that I didn't hear you mention that in response to Judge Wardlot's question. Absolutely not, Your Honor. We are not abandoning that. I agree completely that Idaho did its best here to not only provide for the privacy but also to give an accommodation. And it's possible that some of the past accommodations made and mentioned in the declarations wouldn't have satisfied SB 1100. SB 1100 is clear that, upon request, any student must be given an accommodation, whether it's for an overnight accommodation, whether it's a bathroom, whether it's a changing facility. Again, Idaho has done its best to accommodate the privacy interests of all of its students, including those who identify as transgender. Thank you. All right, you're over your time. Any further questions? No. Okay. Thank you very much, Counsel. Okay, Mr. Wren, you've got some time left. The government's argument that this law is justified in order to prevent students, cisgender students, to be clear, from feeling embarrassment, shame, or stress, things of that nature, rely entirely on speculation because there is not one piece of evidence in the record that shows that any cisgender student in Idaho actually objects to sharing a facility with a transgender student. And that's critical under heightened scrutiny where speculation, hypothesis, is not enough. The government has to come forward with evidence. And so even if you take the line in Byrd about exposure at face value, we have no evidence here to substantiate that those are borne out in the facts on the ground in Idaho. And even if they were, the point would remain that those students who object to sharing spaces with transgender students have an accommodation available to them under the law, which is that they can go to an alternate facility. And those are very different harms, to be clear, because that is something that accommodates their desire for additional privacy, whereas what the government is suggesting happens to transgender students is that they be shunted off to other facilities that are totally stigmatizing to forcibly use. That is a type of burden that this Court has repeatedly recognized as a significant one of constitutional magnitude. Before you depart, you're appealing the denial of the motion for preliminary injunction, which you sought a preliminary injunction striking down enforcement of the Act in all respects, right? That is absolutely part of the ask, yes. That's what you asked for, and that's what was denied. But the government made a motion to dismiss this case, and the district court judge denied that motion as well. Yes. So if we affirm the district court on what he did in this specific case procedurally, what happens next? The litigation would continue in the district court, but the problem with that, Your Honor, is that the rationales for why the district court believed that there was, for example, no equal protection violation was that the mere presence of transgender students is a sufficient government interest to warrant the categorical exclusion of transgender students. The district court adopted the Adams Court reasoning. Your motion was to all facilities, and I think you've heard from questioning up here that maybe there's a difference among facilities and among applications. That's not a difference that the government has substantiated is borne out with evidence. And at a minimum, the relief— You haven't proceeded with this case. But under a preliminary injunction, the government is still required to come forward with evidence, Your Honor. That's their burden, both as nonmovements but also because of heightened scrutiny. And they haven't introduced a single piece of evidence to support those justifications. But at a minimum, the relief that plaintiffs sought does include— That's not their argument. They're saying that all these facilities implicate the same privacy interests. And I think you might have heard from the questioning that some of the jurors, and certainly if you look at the inter-circuit split that's developing around, for example, bathrooms, that different jurors have different thoughts distinguishing the types of facilities that you are talking about. I would commend the court to the Seventh Circuit's reasoning in AC where that court held that locker room use, for example, was indistinguishable from bathroom use because the same privacy accommodations that would accommodate an objecting student are available exactly the same way in both facilities. So, counsel, this is not going to be a question, but as you're commending the court to look at various things, I commend you to perhaps listen to what Judge Wardlaw was saying to you. Thank you, Judge Bennett. Sometimes it takes a judge to tell another judge to get someone to listen. If there are no further questions, we urge the court to reverse and maintain the status quo. Thank you. Thank you very much. Roe v. Critchfield will be submitted. We have previously submitted Russell v. Walmart. And let me just check if there's anything further. Okay, this session of the court is adjourned for today. Thank you. All rise. This court for this session stands adjourned.
judges: WARDLAW, CHRISTEN, BENNETT